**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAWYER COLE, | ) | |
| | ) | Civil Action No. 2:19-cv-00375 |
| Plaintiff(s), | ) | |
| | ) | Chief United States Magistrate Judge |
| v. | ) | Cynthia Reed Eddy |
| | ) | |
| | ) | |
| CENTRAL GREENE SCHOOL | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Presently pending before the Court is a motion to dismiss (ECF No. 15) filed on behalf of

Defendants. For the following reasons, the motion will be granted.[1]

### I. Procedural History

On April 3, 2019, Plaintiff Sawyer Cole ("Plaintiff") initiated this action with the filing of

a Complaint against Defendants, Central Greene School District ("the District"), Helen

McCracken (Superintendent) ("Superintendent McCracken"), Matthew Blair (Assistant

Superintendent) ("Assistant Superintendent Blair"), Andrew Zimmer (School Resource Officer)

("Officer Zimmer"), Justin Stephenson (Vice Principal) ("Vice Principal Stephenson") and

Robert Stephenson (Principal ) ("Principal Stephenson"). Plaintiff asserts Defendants violated

his constitutional rights after he was suspended and expelled from high school for suspicion of

---

[1] Under the Federal Magistrate Judges Act ("the Act"), a Magistrate Judge's jurisdiction may be conferred by consent of the parties. 28 U.S.C. § 636(c). Under the Act, "[u]pon consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). Consent of all parties to a case gives the magistrate judge full "authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003); *In re Search of Scranton Hous. Auth..*, 487 F.Supp.2d 530, 535 (M.D. Pa. 2007). The parties have consented to jurisdiction before a Magistrate Judge. (ECF Nos. 19, 20).

drug use. On June 24, 2019, Defendants filed a motion to dismiss. The matter has been fully briefed and is ripe for consideration.

We have jurisdiction pursuant to 28 U.S.C. § 1331.

## II. Factual Allegations

The following facts are either alleged in the complaint, which the Court will accept as true for the sole purpose of deciding the pending motion, appear in the public record or are gleaned from documents relied upon and attached to the Complaint. Plaintiff was enrolled as a senior at Waynesburg Central High School ("the school") in the District. (Complaint ("Compl."), ECF No. 1, ¶¶ 4, 11.) On January 24, 2018, Plaintiff, whose parking privileges had been revoked by the school, parked a car at the Big Lots near the school and walked to the school; he arrived late sometime between 10:15 and 10:30 a.m. (Id. ¶ 12.) This was Plaintiff's 40th day being tardy out of the 90 school days of the school year. (Tr. p. 26.)[2] Shortly after his arrival, one of Plaintiff's teachers observed Plaintiff in a deep sleep during his study hall class. (Id. ¶¶ 14-15.) The teacher thought this behavior was suspicious and reported it to the Vice Principal. (Id. ¶¶ 15-16.) The teacher described the Plaintiff to the Vice Principal as being "out cold."

In response, the Vice Principal Stephenson, along with the Officer Zimmer, located Plaintiff in his workshop class shortly before noon. (Id. ¶¶ 17-18.) Upon entering Plaintiff's workshop class, both the Vice Principal and Officer Zimmer observed the Plaintiff sleeping. (Id. ¶ 19.) When Plaintiff awoke, he had a red mark on his forehead, indicating that his head had been down for some time. (ECF No. 15-4, Transcript of Expulsion Hearing (hereinafter "Tr.") at 9).

---

[2] Plaintiff's appeal of his expulsion proceedings and exhibits are public records filed with the Court of Common Pleas of Greene County and therefore may be considered in deciding the pending motion. *Wheeler v. Wheeler*, 639 F. App'x 147, 151 n. 10 (3d Cir. 2016). They are attached to Defendants' Motion as Exhibits A - C (ECF Nos. 15-2 – 15-4).

As a result of this lethargic behavior, Plaintiff was taken to the Central Office where he was allegedly forced to undergo a medical examination in the presence of the Vice Principal and the Officer Zimmer. (Id. ¶¶ 20-21, 110, 118.) According to Plaintiff's testimony at the February 5, 2018 disciplinary hearing,[3] the medical examination consisted of the school nurse checking Plaintiff's pupil dilation, blood pressure and heart rate. (Tr. at 28). The nurse found Plaintiff's "blood pressure to be extremely high, pulse to be very elevated, and pupils to be dilated [and] not reacting to light." (Id. at 10). According to Officer Zimmer, who has training through the Pennsylvania State Police to recognize symptoms of drug use, Plaintiff's symptoms were "definitely indicative of drug use." (Id. at 22-23). Plaintiff was then questioned about whether he had taken drugs. (Compl. ¶¶ 111). Plaintiff denied taking drugs. (Id. ¶114). Based on the medical examination and Plaintiff's lethargic behavior, Vice Principal Stephenson and Officer Zimmer determined that they had enough information to reasonably suspect that Plaintiff was under the influence of drugs. (Id. ¶ 24). Vice Principal Stephenson then consulted with the Principal Stephenson, who then contacted Superintendent McCracken. (Id. ¶ 27). Vice Principal Stephenson also called Plaintiff's parents and left a message to notify them of the situation. (Id. ¶ 26). In response, Plaintiff's father was told by Principal Stephenson that Plaintiff was in the office for suspected drug use. (Id. ¶¶ 28-29). Before Plaintiff's father arrived at the school, Plaintiff was asked to submit to a urinalysis drug test. (Id. ¶¶ 33, 36). Plaintiff refused to take a drug test. (Id. ¶ 36).

After Plaintiff's refusal, Plaintiff's father arrived at the school and met privately with Plaintiff. (Id. ¶ 38). Principal Stephenson then reiterated to Plaintiff's father that they suspected Plaintiff was under the influence of drugs and would be required to take a drug test. (Id. ¶¶ 37,

---

[3] The Complaint does not describe what the medical examination entailed.

39). According to the Complaint, Plaintiff and his father were advised that if the Plaintiff refused a urinalysis drug test, his refusal would be considered a positive drug test and corresponding disciplinary action would be taken accordingly. (Id). Plaintiff again refused to take the drug test. According to the Plaintiff, School District policy requires a saliva drug test -- not a urinalysis test -- when students are suspected to be under the influence of drugs. (Id. ¶ 41). He asserts that the urinalysis drug test offered by Principal Stephenson did not comport with School District policy. (Id. ¶¶ 40-43). Thus, Plaintiff asserts that the statements from the school officials regarding the urinalysis test were false. (Id. ¶ 40). The Complaint does not state whether Plaintiff or his father were aware of the School District policy at the time Plaintiff refused to take the urinalysis drug test. The first time Plaintiff or his father raised any issue with the type of drug test offered to Plaintiff was at the February 5, 2018 disciplinary hearing. (Id. ¶ 51).

After Plaintiff refused to take the drug test, Plaintiff and his father were notified that Plaintiff was being suspended because under school policy, refusals to submit to a drug test are considered positive drug tests. (Id. ¶¶ 39, 44). That same day, January 24, 2018, Plaintiff and his father were given an official letter from the School District detailing that Plaintiff was being suspended for a period of 10 days. (Id. ¶ 45). The notice also stated that "[d]ue to the severity of this matter, disciplinary action could be taken by the School Directors of Central Greene School District which could include expulsion." (Id. ¶ 46; see also Jan. 24, 2018 Notice of Suspension, Compl., Exhibit B, ECF No. 1-2).

After giving Plaintiff's father a copy of the Notice of Suspension, Plaintiff's father requested a meeting with Principal Stephenson to appeal the suspension. (Tr. at 12). On January 26, 2018, Plaintiff's father met with the Principal Stephenson again to appeal the suspension, at which time Principal Stephenson explained that the suspension was proper under school policy.

(Id.)  Principal Stephenson explained to Plaintiff's father that the next step was an expulsion hearing. (Id.)

Thereafter, on January 29, 2018, Superintendent McCracken sent Plaintiff and his parents a letter detailing the circumstances and sequence of events that led the School to find that Plaintiff was in violation of the High School's drug usage policy, Policy No. 227.1.  (ECF No. 15-3 at 1).  The letter further notified them that the School Board would be holding a hearing on February 5, 2018 to further adjudicate the matter. (Id.) Also, the letter explained the role of the Board as an impartial tribunal, and that any decision they make is appealable to the appropriate state court. (Id.) Finally, the letter provided Plaintiff with the following list of rights he had with regard to the hearing:

> You [(parents)] have the right to appear at the hearing, produce witnesses on [Plaintiff's] behalf, and be represented by legal counsel. You, Sawyer, or your legal counsel shall have a right, upon reasonable request prior to the hearing, to examine written statements about the incident and examine Sawyer's academic and behavioral records.

(Id.) Superintendent McCracken concluded the letter by telling Plaintiff and his parents that if they had any questions, that they could contact her directly. (Id.)

At the February 5, 2018 disciplinary hearing, Plaintiff's father acknowledged receipt of the Superintendent's January 29, 2018 letter. (Tr. at 3, 6). The school solicitor also reiterated to the Plaintiff and his father that they "are afforded every right to offer testimony, cross-examine witnesses, present any exhibits and make any statements to the Board." (Id. at 4). Thereafter, the January 29, 2018 letter was read into the record. Plaintiff's father gave a short opening statement, stating for the first time that the wrong type of drug test was offered to his son. (Compl. ¶51; Tr. at 7). Thereafter, Vice Principal Stephenson testified as to the events of January 24, 2018. (Tr. at 8-13). Plaintiff's father then testified, stating that the school should not have chosen the "nuclear

option of drug testing" because his son was ill on the day in question, attributing his son's behavior to the effects of cold medicine which he himself had given to his son that morning. (Id. at 20). We note that this contradicts the allegation in the complaint that when Plaintiff "was asked if he had used any drugs, he informed the Defendants he had not." (Compl. ¶ 14). He further stated that he was not surprised of his son's conduct and described his son as being "a little overbearing, rude, cocky, and he doesn't always question authority respectfully." (Id.) Plaintiff testified that he was opposed to the urine test, but not the saliva test. He didn't know about the saliva test option, and had he known, he would have taken it. (Tr. at 28). He further testified that he taught his son to never relinquish his personal privacy even if doing so would result in his expulsion from school because his son knew he did nothing wrong to warrant the drug test. (Id. at 21, 29). Officer Zimmer further explained that on previous instances throughout the school year when Plaintiff arrived tardily he usually came into the building with other students; this had occurred on the day in question.

After Plaintiff had a full opportunity to testify, call witnesses, cross-examine School witnesses, and present evidence, the School Board deliberated and voted 5-3 to expel the Plaintiff.[4] (Compl. ¶52; Tr. at 33). The School Board further recommended drug and alcohol counseling with random drug testing. (Tr. at 33).

Plaintiff received an official notice of the expulsion by way of a letter sent by the Assistant Superintendent Blair, on February 6, 2018. (Id.) According to the letter, a cyber school education would be provided to Plaintiff through the District's Cyber School program. (Notice of

---

[4] The Guidelines for the procedure to determine reasonable suspicion of drug use under Policy 227.1 state "If a student refuses to give consent to the taking of the saliva methodology sample, or if the test is otherwise obstructed, compromised or adulterated, a violation of this drug policy shall be presumed and the student shall be subject to any and all of the appropriate disciplinary and non-disciplinary sanctions and procedures which accompany a positive test or other finding of drug or alcohol use." (ECF No. 22-5 at 2).

Expulsion, Compl., Exhibit C, ECF No. 1-36 ("The School District will provide a Cyber School for [Plaintiff]," and Plaintiff's parents should "contact Mr. Matthew Blair for information on beginning this program.")).

On February 16, 2018, Plaintiff appealed his expulsion to the Court of Common Pleas of Greene County, Pennsylvania. (Compl. ¶ 53). The court, in a single page order, overturned the expulsion and reinstated Plaintiff as a student at the High School. (Id. ¶ 55). The court ruled that the District failed to follow its then-existing drug testing policy, Policy Number 227.1. (See March 29, 2018 Court Order on Expulsion Appeal, Compl., Exhibit D, ECF No. 1-4). However, Plaintiff was ordered to undergo a drug and alcohol evaluation and to comply with any and all recommended treatment. (Id.)

Even though the School District offered Cyber School to Plaintiff, Plaintiff alleges that he was deprived of two months of school as a result of his suspension and expulsion. (Compl. ¶ 56). Plaintiff also alleges that when he returned to school, two of his eight classes were resumed. (Id. ¶¶ 58-59). He further asserts that he was ostracized by his friends due to his time away from school. (Id. ¶ 57). Plaintiff graduated from the High School on time. (Id. ¶ 70).

The Complaint alleges four counts. Count I asserts a violation of civil rights pursuant to Title 42 U.S.C. § 1983, specifically, a violation of Plaintiff's procedural and substantive due process rights under the Fourteenth Amendment as to all Defendants. (Id. ¶¶ 71-81.) Count II asserts municipal liability claims under *Monell* as to the District. (Id. ¶¶ 82-92.) Count II asserts a policy and custom claim as well as claims that the District failed to train and supervise Defendants Superintendent McCracken, Assistant Superintendent Blair, Officer Zimmer, Principal Stephenson and Vice Principal Stevenson. (Id.) Count III asserts a claim for violations of the Fourth Amendment for unreasonable search and seizure against the District, Officer

Zimmer and Vice Principal Stephenson. (Id. ¶¶ 93-119.) As to the District itself, Plaintiff asserts the District failed to maintain a policy that respects the civil rights of its students, and that it failed to train and monitor its employees. (Id. ¶¶101-102.) Count III further asserts that Defendants Officer Zimmer and Vice Principal Stephenson subjected Plaintiff to an unreasonable search and seizure by way of a forced medical examination. (Id. ¶¶ 103-119.) Count IV asserts a state claim for malicious use of process claim under the Dragonetti Act against all Defendants. (Id. ¶¶ 120-126.) Count IV asserts that the School Board expulsion proceedings were used maliciously against Plaintiff for "sticking up for his rights." (Id. ¶ 125.) Plaintiff seeks compensatory damages, punitive damages and equitable relief as to all Defendants. (Id. ¶ 17.) The equitable relief consists of the Court ordering the District to undergo training and reform its policies relating to the creation and application of school policy, unreasonable searches and seizures, and understanding the effects and signs of drug use. (Id.) Plaintiff seeks compensatory damages in excess of $100,000. (Id.) Plaintiff also seeks an award of $2,500 as to legal expenses incurred regarding the expulsion hearings. (Id.) Finally, Plaintiff seeks legal expenses relating to this action. (Id.)

### III. Standard of Review

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must

provide more than labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.... Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (*quoting Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr, Corp*., 809 F.3d 780 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal,* 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. *See also Burch v. Milberg Factors, Inc*., 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679.

809 F.3d at 876-77. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (internal citations omitted)

While a District Court is generally limited to a plaintiff's complaint in assessing a motion to dismiss, it may take judicial notice of public records, including records of judicial proceedings. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007). Moreover, when a document is "integral to or explicitly relied upon in the complaint [, it] may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir.1997) (internal quotations omitted).

### IV. Discussion

Plaintiff alleges violations of his constitutional rights pursuant to 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Tatsch-Corbin v. Feathers*, 561 F. Supp. 2d 538, 543 (W.D. Pa. 2008) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

"Section 1983 does not create any rights, but provides a remedy for violations of those rights created by the Constitution or federal law." *Morse v. Lower Merion Sch. Dist*., 132 F.3d 902, 907 (3d Cir. 1997) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979) ); *Puckett v. Miller*, No. CV 15-1019, 2018 WL 658926, at *6 (W.D. Pa. Feb. 1, 2018) (Fischer, J.) (quoting *Morse*, 132 F.3d at 907). Accordingly, "[a] plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right." *Ickes v. Borough of Bedford*, 807 F. Supp. 2d 306, 315 (W.D. Pa. 2011) (Gibson, J.) (citing *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)). "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833,

841 n. 5 (1998)); *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015)

(quoting *Nicini*, 212 F.3d at 806).

As noted by this court in *Davis v. Quaker Valley Sch. Dist.*, No. 13-1329, 2016 WL

912297, at *11 (W.D. Pa. Mar. 10, 2016) (Conti, J.) , *aff'd*, 693 F. App'x 131 (3d Cir. 2017):

> Courts generally afford schools wide discretion with respect to disciplinary decisions. *See Z.H. ex rel. Berish v. Penn Hills Sch. Dist.*, No. C.A. 12-1696, 2013 WL 300753, at *7 (W.D. Pa. Jan. 25, 2013) ("Keeping in mind that 'courts are to refrain from second-guessing school administrators' disciplinary decisions") (quoting *C.S. v. Couch*, 843 F.Supp.2d 894, 910 (N.D. Ind. 2011)); *DT v. Somers Cent. Sch. Dist.*, 588 F.Supp.2d 485, 496 (S.D. N.Y. 2008), *aff'd sub nom., DT v. Somers Cent. Sch. Dist.*, 348 F. App'x 697 (2d Cir. 2009) ("courts have been skeptical of arguments premised on the degree to which a school punishes its students....The Supreme Court further recognized that '[s]chool administrators will continue to enjoy the flexibility they require' and that 'courts should refrain from second-guessing the disciplinary decisions made by school administrators.' ") (quoting *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999)).

Plaintiff has asserted claims under § 1983 for violations of his Fourth Amendment and

Fourteenth Amendment rights.  The Court will discuss each in turn.

## A. Count I: Procedural and Substantive Due Process Rights under the 14th Amendment

### 1. Procedural Due Process

Defendants move to dismiss count I on the grounds that Plaintiff has failed to state a

claim, arguing, inter alia: 1) he has not identified which acts of which Defendants deprived him

of his liberty and property interests; 2) his entitlement to a public education was not infringed

because he was offered alternative public education through a cyber school; and 3) the District

met the constitutionally required process for his suspension and expulsion. In response, Plaintiff

relies upon the Pennsylvania School Code, 22 Pa. Code § 12.6 and § 12.8 as the standard by

which process is due to students.  Defendants cite case law to the contrary.

Plaintiff takes issue with the process afforded him, citing to 22 Pa. Code §§ 12.6 and 12.8, and case law applying those statutes, which require a school to give written notification of the reasons for the suspension before the informal hearing occurs.   He argues:

> The Notice of Suspension failed to notify the Plaintiff and his parents that they could request an informal hearing, present witnesses and cross-examine witnesses in his own defense. See Exhibits A & B attached hereto. This violates the due process requirements of 22 Pa. Code. §12.8(c). The Notice of Suspension also failed to advise the Defendant that anyone would actually seek expulsion, only that the school board could consider it. See Exhibits A & B attached hereto. The Notice of Suspension failed to offer an informal hearing within the first 5 days of the suspension in violation of 22 Pa. Code §12.8(c)(2)(v). See Exhibits A & B attached hereto. The Notice of Suspension was not sent to Sawyer Cole in violation of 22 Pa. Code §12.8(c)(2)(i). See Exhibits A & B attached hereto.

(ECF No. 22 at 4).

This analysis misses the mark. In *Z.H. ex rel. Berish v. Penn Hills Sch. Dist.*, No. 12- cv-1696, 2013 WL 300753, at *4–5 (W.D. Pa. Jan. 25, 2013), the court explained:

> The United States Court of Appeals for the Third Circuit has held that failure to comply with the provisions of 22 Pa. Code § 12.8(c) "does not alone establish a violation of due process." *Shuman ex rel. Shertzer v. Perm Manor Sch. Dist.*, 422 F.3d 141, 150 n. 4 (3d Cir. 2005). As the United States Court of Appeals for the Third Circuit noted, "state law does not ordinarily define the parameters of due process for Fourteenth Amendment purposes; rather, the minimum, constitutionally mandated requirements of due process in a given context and case are supplied and defined by federal law, not by state law or regulations." *Id.* (citing *Patterson v. Armstrong Cnty. Children & Youth Servs.*, 141 F.Supp.2d 512, 537 (W.D. Pa. 2001) (Lee, J.)).

Therefore, Plaintiff's arguments in opposition to the motion to dismiss which rely on state law or regulations are unhelpful in this particular claim, and we rely on the body of federal case law interpreting due process rights.

As noted *supra*, Plaintiff was first suspended and then later expelled.  The Plaintiff herein alleges violations of his due process rights with respect to both.   Once a state undertakes to maintain public school systems and requires students to attend, the state must "recognize a

student's legitimate entitlement to a public education as a property interest protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). A student's suspension can damage a student's standing with fellow pupils and teachers, and therefore, students have a liberty interest in their reputation. *Id.* at 575. As to suspension, *Z.H.* court further explained, "in connection with a suspension of 10 days or less ... the student [must] be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Shuman*, 422 F.3d at 149–50 (quoting *Goss*, 419 U.S. at 581).

Moreover, as the United States Supreme Court has explained:

> There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is ... Since the hearing may occur almost immediately following the misconduct, it follows that as a general rule notice and hearing should precede removal of the student from school.

*Goss*, 419 U.S. at 582.

As to Plaintiff's claim that his procedural due process rights were violated in relation to his expulsion, we note the following. In cases since *Goss*, "precedents hold that long-term suspension or expulsion procedures must provide an accused student with the minimum requirements identified in *Goss*." In this circuit, discipline greater than the ten-day or less suspension in *Goss* "[does] not necessarily warrant additional procedures." To determine "the contours of what process is due for student disciplinary procedures, courts in the Third Circuit apply the balancing test set forth in *Matthews v. Eldridge*, 424 U.S. 319 (1976)." Under

*Matthews*, courts must balance (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Haney,* 2018 WL 3917975 at *4, quoting *Matthews*, 424 U.S. at 335. The bulk of Plaintiff's arguments against dismissal are not on point. The School Code and school policy do not define the parameters of a federal due process claim. *Shuman*, 422 F.3d at 150 n.4.

With this standard in mind, we repeat the allegations and the uncontroverted record before us. On the day he was found sleeping in class and was called into the office at school, January 24, 2018, he was notified personally and in writing that additional disciplinary action "could be taken by the School Directors of Central Greene School District which could include expulsion." (Notice of Suspension, ECF No. 1-2). He was notified that refusal to take the drug test would result in disciplinary action. He was given the opportunity to explain his version of the facts. His father was present and was also notified. Again, to meet minimal constitutional requirements, "the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Goss,* 419 U.S. at 582; *see also C.B. by and Through Breeding v. Driscoll*, 82 F.3d 383, 386 (11th Cir. 1996) (citing *Goss*, 419 U.S. at 583)("[O]nce school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands.")

In a letter dated January 29, 2018, Plaintiff's parents were notified that on the day in question, Plaintiff "refused to submit to the drug test even after being notified that it would be considered the same as a positive result that would lead to a suspension and also the possibility

of expulsion." (ECF No. 15-4 at 41).  He was notified the date, time and place of the  hearing, with the Board sitting "as an impartial tribunal with authority to examine exhibits, hear testimony, and consider all evidence" and notifying Plaintiff of his right to appear, produce witnesses, be represented by legal counsel, as well as a right to request written statements and other relevant records  (ECF No. 15-3 at 9).  He was told (both in the Notice of Suspension and in the expulsion letter) that the policy he was alleged to have violated was Board Policy 227.1, the drug usage policy.[5]  (*Id.*)

The formal School Board hearing was held.  The undersigned has read the hearing transcript in its entirety.  (ECF No. 15-4).  Plaintiff and his father appeared,  were given an opportunity to testify, cross-examine witnesses and to present any exhibits and make statements to the Board.  Plaintiff's father testified, and after the vote to expel was held, Plaintiff was formally told in writing by a Notice of Expulsion dated February 6, 2018 that he could not physically access the high school and further, he was offered a public education through the District's Cyber School.  (ECF No. 15-3 at 14).  He was given an opportunity to appeal, and he did.  (ECF No. 15-3).

The motion to dismiss the procedural due process claims will be granted as to all Defendants.  The procedures employed by the District and its employees were constitutionally sufficient, given the District's need to maintain order and discipline in school and to prevent drug use among students. Even accepting all of the factual averments in Plaintiff's Complaint as true, Plaintiff has failed to allege sufficient facts to support the inference that Defendants violated his

---

[5] No new policy was "enacted" by the Principal Stephenson, and the case cited by Plaintiff, *Furey v. Temple University*, 730 F.Supp.2d 380 (E.D. Pa. 2010) is inapposite as its holding does not reach alleged departures from school policies per se (such as the drug policy here)  but rather, suspension or expulsion processes which implicate due process rights.

procedural due process rights in connection with his disciplinary hearing, suspension and ultimate expulsion.[6]

Accordingly, Plaintiff's allegations of violations of his procedural due process under the Fourteenth Amendment will be dismissed with prejudice.

## 2. Substantive Due Process

Defendants further argue that Count I of the Complaint fails to state a claim for violation of substantive due process. Defendants argue that to sustain a substantive due process claim, Plaintiff must allege that Defendants' conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846–48, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir.2001); *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir.1994) (en banc). Thus, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento*, 523 U.S. at 849, 118 S.Ct. at 1718.

Yet in this context we note there is no fundamental right to a public education under the United States Constitution. *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 35-36, 93 S.Ct. 1278 (1973). Thus, property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution. *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 229, 106 S. Ct. 507 (1985). Therefore, because his property interest in receiving a free

---

[6] Moreover, to the extent Plaintiff alleges the placement in the cyber school was unconstitutional, we note that it is well-established that a student's choice of schools is not a protected liberty interest under Fourteenth Amendment. *Pocono Mountain Charter School v. Pocono Mountain School Dist.*, 442 Fed. Appx. 681, 685 n. 5 (3d Cir. 2011). As to a claim that his due process rights were violated for a deprivation of a liberty interest in reputation, plaintiff must allege a stigma to his reputation *plus* deprivation of some additional right or interest, i.e. "stigma-plus" test. *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006). Here, although Plaintiff has alleged his reputation was harmed as a result of his removal from school he has not sufficiently alleged a deprivation of an additional right or interest.

public education is derived from Pennsylvania law and not the United States Constitution, Plaintiff is unable to raise a substantive due process claim. *Through Breeding v. Driscoll*, 82 F.3d 383, 386 (11th Cir. 1996) (citing *Goss,* 419 U.S. at 583); *see also Astacio v. East Brunswick High School*, C.A. 16-938, 2019 WL 3843090, *13 (D. N.J. Aug. 15, 2019)

We conclude that Plaintiff cannot sustain a substantive due process claim against Defendants. The conduct alleged here simply does not rise to the high level needed for a constitutional violation, and Plaintiff's counsel has not cited to any caselaw to conclude otherwise. Plaintiff's right to attend a public school is not a fundamental right for the purposes of substantive due process.

Accordingly, the substantive due process claims as alleged are dismissed with prejudice.

### B. Count II: Municipal Liability under *Monell*

The District argues that the Complaint fails to allege a viable claim against it under the standards set forth in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 US. 658 (1978) and its progeny. A municipality or other local government may be liable under § 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *Id.* at 692. Under § 1983, local governments are responsible only for "their own illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S., at 665-683). They are not vicariously liable under § 1983 for their employees' actions. *See id.,* at 691; *Canton v. Harris*, 489 U.S. 378, 392 (1989); *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases).

Count II alleges municipal liability as to the District for failure to train and supervise as to well as a policy and custom claim.

### 1. Policy and Custom

Hence, to establish municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom, or practice of the municipal defendant that results in the constitutional violation. *Monell*, 436 U.S. at 690-91. A municipal policy is deemed to have been made "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990), superseded in part by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072 (1991) (quoting *Pembaur*, 475 U.S. at 481). Finally, "[i]n addition to identifying a policy or custom, a plaintiff bears the burden of proving that the municipal practice in question was the proximate cause of the violation of his constitutional rights." *Hodinka v. Delaware Cnty.*, 759 F. Supp. 2d 603, 615 (E.D. Pa. 2011) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). To accomplish this, the plaintiff must show either an "affirmative link" or "plausible nexus" between the custom or practice and the alleged constitutional deprivation. *Bielevicz*, 915 F.2d at 850-51.

Plaintiff alleges that the District adopted a new, unwritten drug policy requiring a urinalysis test, and that the delegation of the rule-making power of the administrators to Principal Stephenson and Vice Principal Stephenson ratified their actions. Plaintiff argues that the Principal Stephenson stated an entirely new policy regarding the types of drug testing and which testing could serve as a basis for suspension. He further argues that the District's failure to adopt a policy, and instead abdicating responsibility to the "ad-hoc- whims" of Principal Stephenson and Vice Principal Stephenson, it was deliberately indifferent.

There are several weaknesses in Plaintiff's attempt to hold the District liable under §1983 for the actions of its employees. As alleged, there was not a policy, defined as "made when a

'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990).

Plaintiff alleges that Principal Stephenson attempted to change the drug testing policy (by requiring a urinalysis rather than saliva test) (Complaint at ¶88), that he made the decision to suspend Plaintiff based on this "new" policy (Complaint at ¶ 89), and that the District failed to train officials and in fact, ratified the "new" policy" in the expulsion proceeding "although the decision and policy had already been made regarding the suspension." (Complaint at ¶ 92). These allegations fail to state a *Monell* claim. We are guided by the recent holding in *Flood v. Sherk*, 400 F.Supp.3d 295 (W.D. Pa. 2019). In that case, the Honorable Mark R. Hornak, in analyzing whether plaintiff therein had stated a viable claim under *Monell*, explained that under the hierarchical structure of student discipline in Pennsylvania public schools:

> At the top, the school board of directors in each district formulates and promulgates the official rules and policies for student conduct and discipline. District superintendents receive reports from associate and assistant district superintendents, along with school principals, all of whom are tasked with supervising matters related to student discipline within the schools. Teachers and school principals are tasked with enforcing a school district's disciplinary rules "on the ground" in their respective schools. Building principals enforce the rules, superintendents supervise the principals, and the school board has the final say as to student conduct and discipline.
> Undoubtedly, this statutory scheme affords school principals some discretion and decisionmaking authority, but decisionmaking authority does not equate to final policymaking authority for purposes of *Monell* liability. Rather, an official must have final, unreviewable discretion to make a decision or take an action for such a discretionary act to be considered an act of the municipality itself. This is so even if that official—here, the school principal—allegedly deviates from School District disciplinary policy because, those policies, rather than the subordinate's departures from them, are the act of the municipality. Indeed, district courts in the Third Circuit appear to uniformly refuse to consider a school principal to be a final policymaker such that a principal's disciplinary decisions, without more, could subject a school district to liability under § 1983. Pennsylvania law grants school principals discretion in disciplinary decisions, but

> not unreviewable discretion, and thus these discretionary disciplinary decisions are not actions attributable to the School District for § 1983 liability purposes.

*Flood,* 400 F.Supp.3d at 308 (citations and internal quotations omitted).

There are no allegations[7] of an affirmative proclamation of a policy which can subject the District to *Monell* liability. "[T]he Supreme Court has forbidden courts from 'assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it.'" *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n. 11 (3d Cir. 2010). The District cannot be held liable for the alleged "new" policy, and accordingly, the motion to dismiss will be granted in this regard and the cause of action dismissed with prejudice.

### 2. Failure to Train and Supervise

Plaintiff also names the District as the sole Defendant at Count II for failure to train and supervise Superintendent McCracken, Assistant Superintendent Blair, Officer Zimmer, Principal Stephenson and Vice Principal Stephenson "in their legal duties and requirements to adhere to the guarantees of due process for their students." (Complaint ¶ 90). To establish liability on a failure to train theory through custom or practice, a plaintiff must establish "that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001) (citing Canton, 489 U.S. at 390). "In resolving the issue of a city's liability for failure to train ... 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'" *Sims,* 2016 WL

---

[7] Plaintiff also fails to allege plausible facts to support a claim that the alleged municipal practice proximately caused him to be deprived of a constitutional right. He merely speculates that had he been told that the saliva test was an option, he would have agreed to it, and presumably the test would have been negative, and therefore would not have been subjected to suspension and expulsion.

4801431, at *5 (quoting *Canton*, 489 U.S. at 390). "Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *Connick*, 563 U.S. at 62) (internal quotations omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. Moreover, the identified deficiency in the training program "'[must have] actually caused' the constitutional violation." *Thomas*, 749 F.3d at 222 (quoting *Canton*, 489 U.S. at 391). Furthermore, the United States Supreme Court has held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389. Plaintiff alleges that the Principal Stephenson, Vice Principal Stephenson and Officer Zimmer thought it was acceptable to invent a new policy, and the School Board endorsed the new course of action. Plaintiff further argues that Officer Zimmer and Vice Principal Stephenson's mis-step evinces the District's failure to train.

It is well-established, however, that absent an underlying constitutional violation by an agent of the municipality, the municipality may not be held liable under § 1983. *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir.2003). Because Plaintiff has not plausibly plead that he suffered a violation of his constitutional rights, any derivative § 1983 claim against the District must likewise fail. Moreover, Plaintiff has not alleged facts which would suggest that any training of the individual defendants was so deficient as to reflect deliberate indifference to his rights. He has not identified any training that the individual

defendants underwent, nor any official policy which endorsed the allegedly unconstitutional conduct.  Likewise there is no plausible claim that any similar acts had occurred such that the District would be on notice that a course of training was deficient.  *Connick,* 563 U.S. at 62.

As to any claim for failure to supervise, it is black letter law that in circumstances where a supervising official knowingly permits a continuing custom or policy that results in a constitutional violation, § 1983 liability may attach. *See Colburn*, 838 F.2d at 673. To establish failure to supervise liability, "supervising officials 'must have played an affirmative role in the deprivation of the plaintiffs' rights[;] ... the officials' misconduct cannot be merely a failure to act.'" *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986) (quoting *Commw. of Pa. v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981)). Personal involvement may be shown through "'allegations of personal direction or of actual knowledge and acquiescence.'" *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "At a minimum, such liability attaches 'only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate.'" *Wyland v. Brownsfield*, No. CIV. A. 08-1601, 2011 WL 5445305, at *13 (W.D. Pa. Nov. 9, 2011) (quoting *Colburn*, 838 F.2d at 673) (citation omitted). No liability exists under § 1983 solely based on a theory of vicarious liability or *respondeat superior*. *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990) (citation omitted).

Here, there are no plausible allegations that any supervising officials and contemporaneous knowledge of any offending incidents.  Plaintiff alleges that the improper conduct (as to search and seizure) was bringing him into the central office, questioning him about his drug usage, and allowing the nurse to check his vitals.  Yet any supervisor's

involvement occurred afterwards, when Vice Principal Stephenson contacted Principal Stephenson. So, too, with an alleged violation of due process. Principal Stephenson's issuance of a suspension and the informal hearing at which Plaintiff and his father were notified of disciplinary actions, were taken without the contemporaneous knowledge of his supervisors (here, Superintendent McCracken and Assistant Superintendent Blair).

Accordingly, for these reasons, Count II will be dismissed.

### C.  Count III:  Unreasonable Search and Seizure under the Fourth Amendment

Plaintiff asserts that defendants Officer Zimmer and Vice Principal Stephenson violated his Fourth Amendment rights when they "forced the student to undergo the sham medical examination." (Compl. ¶ 119). Defendants argue he has failed to plead sufficient facts to state a viable claim for an unconstitutional search and seizure. The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., AMEND. IV. The Fourth Amendment applies to searches of public school students conducted by school officials. *See New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985). "[I]n the public school setting, Fourth Amendment claims are not evaluated using the usual probable cause standard." *Salyer v. Hollidaysburg Area Sch. Dist.*, No. CV 3:16-57, 2016 WL 5376218, at *3 (W.D. Pa. Sept. 26, 2016) (Gibson, J.). Rather, "the legality of a search of a student ... depend[s] simply on the reasonableness, under all the circumstances, of the search." *T.L.O.*, 469 U.S. at 341; *see Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009).

Evaluating the reasonableness of a search involves two-steps. *T.L.O.,* 469 U.S. at 341. First, courts must determine whether the search "was justified at its inception." *Id.* (quoting

*Terry v. Ohio*, 392 U.S. 1, 20 (1968) ). The Supreme Court has stated that, "[u]nder ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 341-42.

Second, Courts must assess "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *T.L.O.*, 469 U.S. 341 (*quoting Terry*, 392 U.S. at 20). The Supreme Court has announced that "a school search 'will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.'" *Safford,* 557 U.S. at 370 (quoting *T.L.O.*, 469 U.S. at 342).

Count III alleges that on January 24, 2018, when Plaintiff arrived at school, he was late, having arrived between 10:15 and 10:30; he was observed sleeping during class. Plaintiff alleges he was suffering from a cold and on cold medication. Complaint ¶ 14. The teacher reported his behavior to the Vice Principal Stephenson, and thought it was suspicious. According to hearing testimony, the teacher was "very concerned by this because she repeatedly tried speaking to [Plaintiff] and he was out cold as she phrased it." ( ECF No. 15-4 at 8). Around 11:45 a.m. Vice Principal Stephenson and Officer Zimmer invested the teacher's report by tracking down Plaintiff in workshop class, and both saw Plaintiff sleeping. (Compl. ¶¶ 18, 19). At the hearing, Vice Principal Stephenson explained:

> When we arrived, we found Sawyer with his head down on the desk once again, this time with headphones on. When we spoke to Sawyer, he lifted his head up off the desk and had a red mark across his forehead to indicate that his head was down for some time. We walked Sawyer down to the nurse to be evaluated. Sawyer was evaluated by the nurse and his vitals were all very high, as the nurse indicated to us. At that time, the determination was made by

the administration that there were reasonable suspicion in regards to Sawyer being under the influence. We took [him] to the office and explained this to him.

(ECF No. 15-4 at 9).

Plaintiff alleges Vice Principal Stephenson and Officer Zimmer "forced Mr. Cole to undergo a targeted medical evaluation in their presence without asking for his consent" and that he was not "asked whether he had taken any medications prior to coming to school." (Compl. ¶¶ 21, 22). Principal Stephenson testified that the school nurse "found [Plaintiff's] blood pressure to be extremely high, pulse to be very elevated and pupils to be dilated, which were not reacting to light." (ECF No. 15-4 at 10). Officer Zimmer, who has been trained through the Pennsylvania State Police, testified that, such symptoms were "definitely indicative of drug use." (ECF No. 15-4 at 22-23). Plaintiff explained later that he was ill and on medication and Principal Stephenson, who "agreed, well, that is definitely a possibility and the test will determine what we have, cold medicine or anything else." (ECF No. 15-4 at 23). Plaintiff was asked to submit a urine sample, but could not produce one, and was given water. He was never forced to give a urine sample. Once his father arrived, a discussion was held regarding the consequences of not submitting to the drug test. (ECF No. 15-4 at 11). Plaintiff's father was told that failure to submit to the test would be treated the same as a positive result. (ECF No. 15-4 at 11).

As alleged and as reflected in documents relied upon in the Complaint, the search was justified at its inception because there were reasonable grounds for suspecting the search would turn up evidence that Plaintiff had violated either the law or the rules of the school. This is an objective standard. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 400 (2006). Moreover, the search was reasonably related to the objectives of the search and were not excessively intrusive in light of the Plaintiff's age, sex and nature of the infraction. *Safford*, 557 U.S. at 370. The nurse simply checked his blood pressure, pulse and pupils. Unlike in the criminal context,

where officers need probable cause to conduct a search, a school search is constitutionally permissible if there is "a moderate chance of finding evidence of wrongdoing." *Id*. at 371. And contrary to Plaintiff's counsel's assertions, citation to state law and school policy to support his federal Fourth Amendment search and seizure claim is irrelevant to this decision.

For these reasons, the motion to dismiss Count III will be granted and Count III will be dismissed with prejudice.

### D. Damages

Plaintiff alleges he is entitled to punitive damages against the School District. The District correctly notes that such damages may not be awarded based upon violations of § 1983. *E.B. v. Woodland Hills School District*, C.A. 10-0442, 2010 WL 2817201 (W.D. Pa. July 16, 2010). Plaintiff concedes the point (ECF No. 22 at 26) and therefore the motion to dismiss is granted as to any claim for punitive damages against the District.

### E. Count IV: Dragonetti Act, 42 Pa. C.S. § 8351 et seq.

Having dismissed all of Plaintiff's federal claims, we decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. 28 U.S.C. § 1367(a), (c). "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995). No such circumstances exist in this matter.

### F. Immunity

Defendants argue that they are entitled to qualified immunity, governmental immunity and high public official immunity Because we have found that there are no constitutional claims

and are dismissing those claims, and we decline to exercise jurisdiction over the state law claim at Count IV,[8] we need not address these defenses.

### G. Leave to Amend

The United States Court of Appeals for the Third Circuit "precedent supports the notion that in civil rights cases district courts must offer amendment - irrespective of whether it is requested - when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007); *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). Amendment is futile "if the amended complaint would not survive a motion to dismiss." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014). Under the circumstances of this case, given the allegations and the public record of the proceedings which are directly relied upon by the Plaintiff in his Complaint, any amendment would be futile and therefore all claims are dismissed with prejudice.

### V. Conclusion

For all these reasons, the motion to dismiss will be granted and the complaint will be dismissed with prejudice.


Dated:  December 27, 2019

s/*Cynthia Reed Eddy*
Cynthia Reed Eddy
Chief United States Magistrate Judge

---

[8] It is clear, however, that high public official immunity would apply to Superintendent McCracken and Assistant Superintendent Blair. *Zugarek v. Southern Tioga School Dist.*, 214 F.Supp.2d 468, 479 (M.D. Pa. 2002).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SAWYER COLE,              )

                                )      Civil Action No. 2:19-cv-00375

           Plaintiff(s),    )

                                )      Chief United States Magistrate Judge

       v.                   )      Cynthia Reed Eddy

                                )

                                )

CENTRAL GREENE SCHOOL     )

DISTRICT, et al.,           )

                                )

          Defendant(s).   )

## **ORDER**

AND NOW, to-wit, this 27th day of December, 2019, it is hereby ORDERED,

ADJUDGED AND DECREED that the Motion to Dismiss (ECF No. 15) is hereby GRANTED

and the Complaint is DISMISSED WITH PREJUDICE.

 

 

                                        *s/Cynthia Reed Eddy*

                                        Cynthia Reed Eddy

                                        Chief United States Magistrate Judge

cc: All counsel of record via ECF electronic notification